Filed 4/27/23  P. v. Woody CA2/1

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B318525 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA139893) |
| v. | |
| CHARLES LEE WOODY, | |
| Defendant and Appellant. | |

APPEAL from a judgment and an order of the Superior Court of Los Angeles County, Olivia Rosales, Judge.  Affirmed.

Robert D. Bacon, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

# INTRODUCTION

In an information filed on September 6, 2017, the People charged defendant Charles Lee Woody with first degree murder for the killing of Michael Ramirez, a rival gang member (Pen. Code,[1] § 187, subd. (a); count 1), and with being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 2). The information further alleged firearm and gang enhancements with respect to count one (§§ 186.22, subd. (b)(1)(C), 12022.53, subds. (b)-(d)) and a gang enhancement with respect to count two (§ 186.22, subd. (b)(1)(A)). After a jury trial, defendant was convicted on both counts and the special allegations found true. The trial court sentenced defendant to a total prison term of 50 years to life (25 years to life for the murder, plus 25 years to life for the firearm enhancement on the murder count). The court stayed the sentence for being a felon in possession of a firearm.

On appeal, defendant raises four issues. First, he contends that during jury selection two prospective jurors made statements about gangs that prejudicially contaminated the entire venire. Second, he contends that the trial court erred in failing to bifurcate trial of the gang enhancement allegations (and the related admission of gang-related evidence to support those allegations) from the trial on the charges for murder and being a felon in possession of a firearm. Third, he contends that when defense counsel filed a new trial motion, arguing in part that counsel herself had rendered ineffective assistance in representing defendant, the trial court should have sua sponte substituted in new counsel to represent defendant with regard to

_____

[1] All further statutory references are to the Penal Code, unless otherwise noted.

the new trial motion.  Fourth, defendant contends we should remand for resentencing because the trial court misunderstood its sentencing discretion with regard to the firearm enhancement.

We find defendant's arguments unpersuasive and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We summarize only those portions of the facts and proceedings necessary to our discussion of the issues raised on appeal.

## A.    Pre-trial Proceedings

On October 15, 2019, the defense moved to bifurcate the trial on the gang enhancements and the court denied the motion the following day.

Voir dire took place on October 16, 17, 18 and 21, 2019.  On the last day of voir dire, defense counsel moved for a mistrial based on comments from two prospective jurors during questioning before the entire venire.  The court denied the motion.

We discuss the details of the bifurcation motion, the voir dire, and the mistrial motion below in connection with our analysis of defendant's appellate arguments concerning those events.

## B.    The Trial

Testimony began on October 21, 2019.

### 1.    *Prosecution Case*

#### a.    *The Crime*

Michael "Charlie" Ramirez was shot and killed on the street next to Los Nietos Park in Santa Fe Springs shortly after 9:00 p.m. on Sunday, December 7, 2014.

At the time of the shooting, Ramirez was homeless and rode around on a bicycle. He was in his 50s.

  b.  *Defendant's and the Victim's Gang Affiliations*

Whittier Police Detective Sal Murillo testified as a gang expert for the People. He described his knowledge of gang culture generally and information he had learned about two specific gangs, Los Tres Palmas (LTP) and Canta Ranas.

Detective Murillo identified defendant as a member of LTP based on defendant's tattoos. According to Detective Murillo, LTP had approximately 20 members. It claimed territory in Santa Fe Springs bordered by Los Nietos Road on the north, Telegraph Road on the south, Norwalk Boulevard on the east, and the San Gabriel River on the west.

Ramirez was a member of Canta Ranas, a rival of LTP. "Canta Ranas" is Spanish for singing frogs. Detective Murillo testified that Canta Ranas was a larger gang, having 100 to 120 members. The heart of Canta Ranas's territory was Los Nietos Park. The gang also claimed as its territory the immediate area around the park, including Millergrove Drive. Canta Ranas's territory bordered LTP's territory near Los Nietos Park.

Detective Murillo testified that gang members can gain respect within their gang and "move up the chain of command" through fear and intimidation and committing violent crimes. He also testified that gangs use fear, intimidation and violence to keep rival gangs out of their territory, so that they can engage in crimes that bring in money for the gang, such as sales of narcotics and firearms.

c.      *Witness Testimony About the Evening of December 7, 2014*

On the night of the shooting, at about 5:30 p.m., Christopher Cisneros, who lived near the park, saw defendant drive past Cisneros's property in a light-colored SUV. Cisneros was familiar with defendant and had seen him in the neighborhood before.

In June 2014, defendant purchased a silver Mercury Mountaineer.

Robert Ochoa, a Canta Ranas gang member, lived on Millergrove Drive near the park. Ramirez was Ochoa's best friend. On the day Ramirez was killed, Ochoa was in the driveway of his home and defendant passed by in a car. Ochoa testified, "I think it was a Honda. I don't know." Ochoa could not recall defendant saying anything to him but agreed that he (Ochoa) testified truthfully at the preliminary hearing that defendant asked him, "Where is all your homeboys?" and Ochoa replied, "I don't know, I'm at home and they're probably asleep." Ochoa heard gunshots about 15 minutes after defendant passed by his house. Ochoa believed the gunshots came from the park. After he heard gunshots, Ochoa sent Ramirez text messages and called him, but Ramirez did not respond. Although Ochoa testified that he heard the gunshots during the day, the prosecution presented evidence, discussed further below, that Ochoa called Ramirez's cell phone at 9:15 p.m. and sent him a text at 9:17 p.m. warning him about the gunshots.

On cross-examination, Ochoa testified that police officers came to interview him several times even though he told them he did not know anything about the shooting. Ochoa admitted he had not divulged during these interviews that he had seen

defendant before the shooting.  The first time Ochoa provided this information was during an interview with police officers and a deputy district attorney the day before the preliminary hearing was scheduled (the hearing was later continued and took place about four months later).  Ochoa testified that he did not recall saying during the interview that defendant was driving a black Honda, but he could have said it.  Defense counsel impeached Ochoa with his prior testimony from the preliminary hearing in which Ochoa's description of his interaction with defendant was different as to what specifically defendant said and whether or not defendant got out of his car.

The prosecutor played an audio recording of the interview Ochoa gave to the police and the deputy district attorney before the preliminary hearing.  During this interview, Ochoa said that he had safety concerns about testifying, stating "if I go in the stand, there's some—they find out that I'm going in the stand, then they're gonna get me.  No matter where, they'll get me."  The deputy district attorney asked, "testifying is considered snitching, correct?" and Ochoa responded, "Um, yeah."  Ochoa then disclosed that he had spoken with defendant about 10 minutes before the shooting.  Ochoa stated that he was in front of his house and defendant drove up in a black Honda and got out of his car; the two spoke briefly and defendant asked Ochoa if he was going to go to the park.

At about 9:11 p.m., Cristian Perez, who lived near the park, heard gunshots.  Perez looked out his living room window and saw an SUV quickly drive past his house.  He told the police the SUV was a Ford Explorer, but the officers showed him

photographs of a Mercury Mountaineer[2] and Cisneros believed that the pictured vehicle looked like the type of SUV he had seen drive past his house.[3]

At 9:14 p.m., an anonymous caller called 911 and reported hearing gunshots three minutes earlier in the area of the park.

Daniel Rangel testified under a grant of use immunity. In December 2016, after being arrested for robbery, he offered information about defendant in exchange for pretrial release on his own recognizance; his conversation with police was recorded. At trial, Rangel professed not to know defendant and to have no memory of interacting with defendant on December 7, 2014, before or after the shooting. He claimed to have a poor memory due to using drugs. The prosecutor played portions of the audio recording of Rangel's conversation with police. In the conversation Rangel recounted interacting with defendant in the hours before and after the shooting. At that time, Rangel was staying next door to defendant's relatives, one of whom was "from CR [(Canta Ranas)]." Rangel stated that "we were . . . in the little shed, smoking weed," when defendant arrived and showed them his new gun, which defendant said was "a .45." Defendant said he saw "a frog" and that he was going to "whack him."[4]

---

[2] These photographs were of a Mercury Mountaineer the police had recovered, which was connected to defendant through various evidence described below.

[3] The person who sold the Mercury Mountaineer to defendant testified that the Mountaineer and Explorer have the same body shape but different lights and grilles.

[4] Detective Murillo testified that "frog" is a reference to a Canta Ranas gang member.

Rangel said that defendant is in the "Las Palmas" gang. Defendant left in a silver Ford Explorer. After defendant left, Rangel heard gunshots. Later that night, defendant returned and said he had to get rid of his truck. Defendant said he shot Ramirez.

      d.     *Investigation of the Crime*

At about 9:17 p.m., Whittier Police Officer Edward Nyberg responded to an address on Millergrove Drive that was on "the west side of the street across from the park." Fire department personnel were rendering aid to Ramirez, who was on his back on the sidewalk. There was a bicycle at the scene.

The medical examiner later determined that Ramirez suffered five gunshot wounds, three to his back, one to his armpit area, and one to his elbow. The medical examiner opined the gunshot wounds caused Ramirez's death.

Whittier Police Detective Robert Wolfe saw the coroner pull out a cell phone from Ramirez's pocket. Detective Wolfe saw a text on the phone from Ochoa's number at 9:17 p.m., stating something to the effect, "don't come out 'cause there's a shooting." Senior forensic specialist Steve Gardner from the Whittier Police Department forensically examined the cell phone. He discovered that the cell phone showed a missed call from Ochoa's number at 9:15 p.m. on December 7, 2014, and a text message from Ochoa's number two minutes later, at 9:17 p.m.

Forensic specialists from the Whittier Police Department found 12 expended nine-millimeter casings at the scene. A criminalist at the Los Angeles County Sheriff's Department determined the casings were all fired from the same firearm, a nine-millimeter Luger. A DNA specialist at a regional crime laboratory found sufficient DNA on three of the casings to do a

DNA comparison. The DNA on two of those casings came from a single source; the DNA found on those two casings was consistent with defendant's DNA profile, with random match probabilities (RMP) of 1 in 12 million and 1 in 940,000, respectively. The RMP figure measures how frequently one would expect to find a given DNA sample is consistent with a specific individual's DNA profile.

Cell phone records showed that, around the time of the shooting, a call involving defendant's phone was routed through a cell tower near the park. The records showed that, about four minutes later, defendant's cell phone was moving because calls were routed through three different cell towers. In this time, defendant's cell phone was used to call Benjamin Medina's cell phone and defendant's phone was moving towards the location of Medina's phone. Based on photos of Medina, Detective Murillo testified that Medina was an LTP gang member. Based on the cell towers utilized in the calls, Medina's phone could have been at 9512 Brockway Street in El Monte; the residence at that address was later searched and evidence showed that Medina lived there. Cell phone records showed that both defendant's and Medina's phones were in the Victorville area the day after the shooting; Medina was later found at a residence in Victorville.

On December 12, 2014, someone reported an abandoned Mercury Mountaineer in Whittier. A Los Angeles County Sheriff's deputy responded and found an insurance card with defendant's name on it inside the vehicle; he recognized defendant's name as being someone of interest to the Whittier Police Department, so he contacted the department. A Whittier police officer responded to the location and had the vehicle impounded.

9

Detective Wolfe and forensic specialist Gardner later took the insurance card as evidence. Gardner testified that the Mercury Mountaineer was silver or gray in color. Gardner processed the vehicle for evidence. He collected DNA on a shirt and shoe recovered from the vehicle that was consistent with defendant's DNA profile, with RMP of 1 in 5.3 sextillion. He collected DNA on the inside door handles that was consistent with defendant's DNA profile, with RMP of 1 in 1.7 quintillion and 1 in 190 quadrillion, respectively. Police found particles characteristic of gunshot residue on the shirt; the particles had three elements contained in bullet primer—lead, antimony, and barium—in a form consistent with having been in primer fired in a gun. Based on this, the prosecution's expert opined these particles "are gunshot primer residue." Police also found particles consistent with gunshot residue on the headliner above the driver's seat and on the gear shift knob. The expert opined that, given the grouping of the elements and their morphology, "gunshot primer residue is one explanation for both of those particles to be present." The expert explained that while there are other potential sources for these elements, gunshot primer residue is the only source which has all of them.

e.      *Defendant's Tattoo*

On December 16, 2014, a photograph was posted on Facebook showing defendant with a tattoo on his chin of the word Locos (a clique of LTP), and of the letter C (a symbol for Canta Ranas) with an X through it. The People's gang expert, Detective Murillo, opined such a tattoo "would signify . . . that [the individual with it] put in work for the gang. . . . That they have committed some form of violent crime against another."

10

### f.     *Gang Enhancement Evidence*

Defendant was charged with gang enhancements under section 186.22, subdivision (b) on both counts.  At the time of the trial, section 186.22 provided for additional punishment for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (Fmr. § 186.22, subd. (b); Stats. 2013, ch. 508.)  Detective Murillo testified that LTP's "primary activities" in 2014 were attempted murders, assaults, sales of narcotics, possession of illegal firearms, felony vandalisms and kidnappings.  To prove that LTP had engaged in a pattern of criminal gang activity, Detective Murillo identified David Elias Garcia as a member of LTP and evidence that Garcia had been convicted of a crime was introduced.  Counsel stipulated that Jesse Anthony Ponce was also a member of LTP and had been convicted of a crime.  After being presented with a hypothetical based on the facts of the case, Detective Murillo opined that the murder was committed for the benefit of a gang, and he explained the ways in which such a crime would benefit a gang.

### g.     *Defendant's Stipulation to a Prior Felony*

Defendant stipulated to a prior felony conviction for purposes of the felon in possession charge (count 2).

### 2.     **Defense Case**

Defendant did not testify.

Defendant's grandfather, Charles Woody, Sr., testified that in the 1960s and 1970s he was a member of Canta Ranas and that defendant's father and approximately 20 other relatives had been affiliated with Canta Ranas.  Defendant lived in Whittier

but had family members who lived in the area of Los Nietos Park. Defendant played handball at that park. Defendant was at the park on the Fourth of July in 2014.

Defendant's cell phone location data expert, Ernest Koeberlein, testified that, based on cell phone records, calls made from defendant's cell phone around the time Ramirez was shot could have come from addresses which defendant's grandfather had testified were residences of defendant's relatives in the area of Los Nietos Park.

## C.    Post-trial Proceedings

After the jury convicted defendant, defense counsel filed a motion for new trial based on various grounds, including alleged jury contamination and ineffective assistance of counsel. The prosecutor filed an opposition. The court held an evidentiary hearing, heard oral argument, and denied the motion after taking it under submission.

Following amendments to section 186.22 enacted after the trial (Stats. 2021, ch. 699, § 3), which the prosecutor conceded applied retroactively to alter the elements of the gang enhancements, the court granted the prosecution's motion to strike the gang enhancements prior to sentencing.

After the court imposed sentence, defendant filed a timely notice of appeal on February 22, 2022.

## DISCUSSION

## A.    The Trial Court Did Not Abuse Its Discretion in Denying Defendant's Mistrial Motion Based on Comments by Two Prospective Jurors

Defendant contends that two prospective jurors made statements before the entire venire during jury selection that

equated gangs with violence, and that these statements affected the views of the other members of the venire such that the jury was not fair and impartial.

### 1. *Voir Dire*

#### a. *Prospective Juror No. 1287*

During jury selection, the trial court asked if any of the prospective jurors, or someone close to them, had been a victim of gang-related violence. Prospective Juror No. 1287 (No. 1287) and several others raised their hand.

The judge first questioned these prospective jurors as a group, outside the presence of the entire venire. In this setting, No. 1287 stated: "Well, I grew up in South Central, so I saw a lot of gang violence when I was growing up. Like for me, I got a gun pulled on me, seen friends get jumped with guns. Also, a relative got shot in the head." No. 1287 said it would be difficult to judge this case solely on the evidence presented, but that he could try to be fair.

No. 1287 was later seated in seat number 2. Once seated, and back before the entire venire, No. 1287 stated in response to the court's questioning, "My neighbor—well, two brothers were killed by gang members." The "murders happened a year apart," about 17 years ago. "One was really brutal. The other one was just shot." The trial court asked No. 1287 if there was anything about those incidents that would affect the way he considered this case. No. 1287 responded, "Yes, because I am really biased towards gang activity since I seen a lot of it growing up." The court asked, "When you say you are biased towards it, you mean you don't like gangs?" No. 1287 answered in the affirmative.

The trial court then asked "whether the fact that you have that bias against gangs, would you hold it against . . . defendant

13

in this case?" No. 1287 replied, "Yes, because all my life I know how gangs work. You have to be really violent to be in it. And—." The court interrupted, stating, "Okay. Let me stop you there. Thank you," and then started questioning another prospective juror.

When the prosecutor questioned him, No. 1287 indicated it would be difficult to presume defendant was innocent because No. 1287 had seen a lot of gang violence growing up. The prosecutor asked, "Have you seen anything that has to do with the particular person here today?" No. 1287 responded, "No, but I know how gangs work." Defense counsel objected and asked to be heard at sidebar. The trial court denied a sidebar conference but told the prosecutor, "Can you move on." The prosecutor then began questioning another prospective juror.

b. *Prospective Juror No. 0188*

Prospective Juror No. 0188 (No. 0188) was seated in seat number 4. When defense counsel asked if any prospective jurors had an issue with tattoos, No. 0188 responded: "I don't have an issue with usual tattoos, but I just have to honestly say I have a visceral response when I see somebody with massive tattoos on their face." Defense counsel noted that defendant "obviously" had tattoos on his face. No. 0188 agreed it would be difficult to set aside her feelings and be fair and impartial. No. 0188, who was a physician, also stated: "I've worked in emergency rooms and seen people come in who were shot and died in front of me and stuff from gang violence."

c. *Defense Counsel's Challenges for Cause and Motion for Mistrial*

The trial court granted defense challenges to No. 1287 and No. 0188 for cause. Defense counsel also requested a mistrial

14

based on No. 1287's comment, "You have to be really violent to be in [a gang]." Defense counsel argued No. 1287 was "almost like a gang witness . . . . He has had a ton of experience with gangs." The trial court denied the mistrial motion, stating, "I don't think it rises to the level of contaminating the entire jury." Defense counsel did not make any mistrial request based on statements by No. 0188.

### 2. *Defendant Argues Jury Contamination in His Motion for a New Trial*

In his new trial motion, defendant argued the statements from No. 1287 and No. 0188 prejudicially contaminated the jury. In denying the motion, the trial court noted that neither juror was seated, there was no evidence that the statements by Nos. 1287 and 0188 influenced the 12 jurors who were in fact seated, and that the court had instructed the jurors "that they will make their decision based on the evidence presented. And there's nothing to indicate that they did not do that in this case."

### 3. *Legal Principles and Standard of Review*

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" ' [citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.) " ' " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. . . .' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of

15

receiving a fair trial have been irreparably damaged.' " ' "
[Citation.] . . . .' [Citation.]" (*People v. Harris* (2013) 57 Cal.4th
804, 848.)[5]

" ' " ' " 'We review a trial court's ruling on a motion for a
new trial under a deferential abuse-of-discretion standard.'
[Citations.]  ' "A trial court's ruling on a motion for new trial is so
completely within that court's discretion that a reviewing court
will not disturb the ruling absent a manifest and unmistakable
abuse of that discretion." ' " ' " ' [Citation.]" (*People v. Parker*
(2022) 13 Cal.5th 1, 88.)  A trial court abuses its discretion when
it " 'exercise[s] its discretion in an arbitrary, capricious, or
patently absurd manner that result[s] in a manifest miscarriage
of justice.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983,
1004.)

####    4.    *Analysis*

We disagree with defendant's assertion that the trial court
abused its discretion by failing to exclude the entire venire and
restart jury selection from scratch following the statements by
Nos. 1287 and 0188.  In making this argument, defendant
primarily relies on *Mach v. Stewart* (9th Cir. 1997) 137 F.3d 630
(*Mach*).  In that case, the Ninth Circuit overturned a defendant's
conviction for sexually assaulting an eight-year-old girl because a
prospective juror said during voir dire "(a) that she had a certain

---

[5] Defendant argues, without support, that reversal is
required unless the prosecution can prove the alleged voir dire
errors were harmless beyond a reasonable doubt.  We reject such
a proposed standard of review for the voir dire errors alleged
here, as it is inconsistent with governing case law.  (E.g., *People
v. Harris, supra*, 57 Cal.4th at p. 848; *People v. Medina* (1990) 51
Cal.3d 870, 889.)

16

amount of expertise in this area (she had taken child psychology courses and worked with psychologists and psychiatrists; she worked with children as a social worker for the state for at least three years); and (b) [further made] four separate statements that she had *never* been involved in a case in which a child accused an adult of sexual abuse where that child's statements had not been borne out." (*Id.* at pp. 632-633.) The Ninth Circuit reversed because, "The bulk of the prosecution's case consisted of a child's testimony that [the defendant] had sexually assaulted her. We thus find [the prospective juror]'s statements to have substantially affected or influenced the verdict . . . ." (*Id.* at p. 634, fn. omitted.)

This case is distinguishable from *Mach* because No. 1287 did not disclose having any specialized knowledge particular to the case at hand. The pertinent questioning of No. 1287 before the entire venire was short, and the trial court limited it to prevent any prejudice. No. 1287's statements were based on personal experiences living in a different neighborhood from defendant, the victim, and the murder location. There was no connection between No. 1287's personal experiences and defendant, LTP, the victim, or Canta Ranas. Nothing indicates No. 1287 had any knowledge of LTP. Referring to defendant, the prosecutor asked No. 1287, "Have you seen anything that has to do with the particular person here today?" and No. 1287 responded he had not. In addition, No. 1287's opinion—that gang members are violent—did not logically imply that defendant had committed murder.

No. 0188's statement that she has "a visceral response when I see somebody with massive tattoos on their face" was an expression of her personal opinion. No. 0188's statement that,

17

"I've worked in emergency rooms and seen people come in who were shot and died in front of me and stuff from gang violence," was a generic statement regarding gang violence that did not suggest she had any information about defendant or LTP. In contrast, the prospective juror in *Mach* had specialized training and referred to her work. In addition, neither No. 1287's nor No. 1088's opinion was "directly connected" with defendant's guilt as was the prospective juror's statement in *Mach* which directly suggested that the complaining witness was telling the truth. (*Mach*, *supra*, 137 F.3d at p. 634.)

Furthermore, once jurors were seated (a group that did not include either No. 1287 or No. 0188), the trial court instructed the jury on how it could consider gang activity, including that it was not to rely on evidence of gang activity to conclude defendant "is a person of bad character or that he has a disposition to commit crime." (CALCRIM No. 1403.) The jury was also instructed to decide what happened based only on the evidence, and to not let bias or prejudice influence its decision. (CALCRIM No. 200.) "Jurors are presumed to understand and follow the court's instructions." (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

## B. The Trial Court Did Not Commit any Prejudicial Error in Refusing to Bifurcate Trial of the Gang Enhancement Allegations

In moving before trial to bifurcate the gang enhancement allegations, defendant argued that gang-related evidence was unduly prejudicial because the prosecution's case was weak and circumstantial, so the prosecution would be relying on the jury to infer defendant's guilt based on gang affiliation. The trial court denied the motion, finding the gang evidence was relevant to motive, to identification (given that individuals involved in the

18

case went by both given names and gang monikers), to explain language and terms used by witnesses, and to provide context for other evidence such as witnesses' reluctance to testify.[6]

On appeal, defendant contends the court should have bifurcated the gang allegations under either the law in effect at the time of his pretrial motion, or under section 1109, a new law which became effective after the trial in this case and requires bifurcation of gang enhancement allegations upon a defendant's request. We first review the trial court's ruling under the law at the time the ruling was made, and then discuss section 1109.

### 1. *The Trial Court Did Not Abuse Its Discretion in Denying Bifurcation Under Then-existing Law*

At the time of defendant's trial, a trial court had "discretion to bifurcate the trial of a gang enhancement allegation from the trial of the substantive offense." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 952 (*Franklin*), citing *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1050 (*Hernandez*).) In *Hernandez*, our Supreme Court held that, "To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary." (*Hernandez, supra*, at pp. 1049-1050.) In addition, "Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation." (*Id.* at p. 1050.) Based on the interest in avoiding

___

[6] Defendant argued in his motion for a new trial that the trial court's denial of bifurcation was error.

19

the increased expenditure of funds and judicial resources which may result with bifurcation, "the trial court's discretion to deny bifurcation of a charged gang enhancement is . . . broader than its discretion to admit gang evidence when the gang enhancement is not charged." (*Id.* at p. 1050.) We review the court's exercise of discretion on a motion to bifurcate "based on the record as it stood at the time of the ruling." (*Franklin*, *supra*, at p. 952.)

In denying bifurcation, the trial court relied on the relevance of gang evidence on the murder charge to motive, identification, and providing context for terminology used by witnesses as well as witnesses' reluctance to testify. We conclude the court acted within its discretion in making its ruling. (See *Hernandez*, *supra*, 33 Cal.4th at p. 1049 ["Evidence of the defendant's gang affiliation . . . can help prove identity, motive, . . . or other issues pertinent to guilt of the charged crime"]; *People v. Pettie* (2017) 16 Cal.App.5th 23, 44 ["Evidence of [the] defendants' gang involvement was . . . probative to explain why a witness might be reluctant or afraid to testify against them"].)

The prosecution's theory of the case was that defendant was a member of LTP and had murdered Ramirez, a member of the rival Canta Ranas gang, to enhance defendant's status within LTP and the status of the gang itself. Thus, defendant's membership in LTP and Ramirez's membership in Canta Ranas were relevant to the underlying charges. In addition, testimony regarding the culture of LTP and gangs in general was relevant to explain why defendant would murder Ramirez, even though there did not appear to be any history or substantial connection between them. Evidence of gang culture was also relevant to explain the context of some of the evidence, such as why defendant would engage Ochoa before the murder at the risk of

20

implicating himself.  Finally, evidence of gang culture was relevant to explain Ochoa's reluctance to testify.

Similar factors led both the *Hernandez* and *Franklin* courts to conclude that trial courts had acted within their discretion in denying bifurcation.  In *Hernandez*, the court explained that much of the gang evidence at issue was relevant to the charged offense, including the defendant's motive.  (*Hernandez*, *supra*, 33 Cal.4th at pp. 1050-1051.)  The court found that "[e]ven if some of the expert testimony would not have been admitted at a trial limited to guilt," "[a]ny evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of [the] defendants' actual guilt." (*Id*. at p. 1051.)  *Franklin* likewise concluded that the trial court did not abuse its discretion in denying bifurcation where "[t]he prosecution's theory was that [the defendant]'s motive in committing the crimes was to protect his status in the gang and strike back at [the victim] for disrespecting him and his gang" and the gang evidence "was thus relevant to the prosecution's theory of motive."  (*Franklin, supra*, 248 Cal.App.4th at p. 953.)  As was the case in *Hernandez,* the modicum of additional evidence admitted in support of the gang enhancements that was not relevant to the underlying charges was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendant's actual guilt.  (*Hernandez, supra*, at p. 1051.)

Defendant relies on *People v. Albarran* (2007) 149 Cal.App.4th 214, but that case is distinguishable.  There, a divided panel held the trial court erred in admitting gang

21

evidence which "was used to create a motive not otherwise suggested by the evidence." (*Id*. at p. 226.)  Here, in contrast, the evidence suggested the motive for the murder was in fact gang-related.  There was evidence that defendant was an LTP gang member, that Ramirez was affiliated with a rival gang (Canta Ranas), and that the shooting took place near the purported territorial border between the two gangs.  There was also evidence that before the shooting defendant announced his presence to a Canta Ranas member, Ochoa, and that defendant told Rangel that defendant had seen "a frog" (meaning a Canta Ranas gang member) and that he was going to "whack him."  Finally, after the murder a photograph was posted on Facebook showing defendant with a tattoo on his chin of the letter C (a symbol for Canta Ranas) with an X through it, signifying defendant had committed a violent crime against a Canta Ranas member.

## 2. *Even if Section 1109 Applies Retroactively, Any Error in Failing to Bifurcate Was Harmless*

After the trial in this case had concluded, the Legislature enacted section 1109 which requires a court to bifurcate the trial of gang enhancement allegations if the defendant requests it. (Stats. 2021, ch. 699, § 5.)  Section 1109 provides in relevant part: "If requested by the defense, a case in which a gang enhancement is charged . . . shall be tried in separate phases as follows:  [¶] (1) The question of the defendant's guilt of the underlying offense shall be first determined.  [¶]  (2) If the defendant is found guilty of the underlying offense and there is an allegation of an enhancement . . . , there shall be further proceedings to the trier of fact on the question of the truth of the enhancement. . . ."  (*Id*., subd. (a).)  Section 1109 took effect on January 1, 2022.  (*Ibid.*;

*People v. Perez* (2022) 78 Cal.App.5th 192, 206, review granted Aug. 17, 2022, S275090.)

Defendant argues that section 1109 applies retroactively under *In re Estrada* (1965) 63 Cal.2d 740, and therefore the court erred in denying his motion to bifurcate and the case must be remanded for a new trial. The Courts of Appeal are split on whether section 1109 applies retroactively or prospectively, and the issue is pending before our Supreme Court. (*People v. Boukes* (2022) 83 Cal.App.5th 937, 948 [§ 1109 applies only prospectively], review granted Dec. 14, 2022, S277103; *People v. Montano* (2022) 80 Cal.App.5th 82, 108 [§ 1109 applies retroactively to nonfinal cases]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 [§ 1109 applies only prospectively], review granted Aug. 17, 2022, S275341; *People v. Perez*, *supra*, 78 Cal.App.5th at p. 207 [§ 1109 applies only prospectively], review granted Aug. 17, 2022, S275090; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129-1130 [§ 1109 applies retroactively to non-final cases]; *People v. Burgos* (2022) 77 Cal.App.5th 550, 568 [§ 1109 applies retroactively to nonfinal cases], review granted July 13, 2022, S274743.)

We need not decide whether section 1109 applies retroactively because even if we assume it does, the court's failure to bifurcate was harmless. In *People v. Tran* (2022) 13 Cal.5th 1169 (*Tran*), our Supreme Court held that, even assuming section 1109 applies retroactively (an issue which it did not decide), a trial court's error in failing to bifurcate trial of a gang enhancement allegation under section 1109 is subject to harmless error analysis. (*Tran*, *supra*, at p. 1208.)

As an initial matter, we must determine the proper test to apply when assessing the assumed error. *Tran* states that error

23

under section 1109 is subject to the state-law harmless error standard under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), unless the error rendered the trial " 'fundamentally unfair,' " in which case the stricter harmless error standard under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) applies. (*Tran, supra,* 13 Cal.5th at p. 1209, italics omitted.)

The court's denial of bifurcation in this case did not cause fundamental unfairness such that the *Chapman* harmless error standard would apply. The prosecution did not rely solely on gang evidence to prove guilt. Rather, the prosecution relied on forensic DNA and gunshot residue evidence that tied defendant to the murder, cellphone records and eyewitness testimony placing defendant in the area of the murder at the time it happened,[7] Rangel's recorded statement that defendant said he was going to murder a Canta Ranas gang member and later admission he had done exactly that, and defendant's abandonment of his vehicle and flight to Victorville after the murder. (See *Tran, supra,* 13 Cal.5th at p. 1209 [trial not fundamentally unfair where prosecutor relied on "testimony and prior statements of a few key witnesses"].)

We therefore apply the state law harmless error standard articulated in *Watson* to weigh the assumed error. (*Tran, supra,* 13 Cal.5th at p. 1209; see *People v. Oliva* (2023) 89 Cal.App.5th 76, 91-92 & fn. 8 [applying *Watson* standard]; *People v. Ramos,*

---

[7] Defendant presented his own cell phone location data expert to make the point that, while the data did show he was in the area of the park at the time of the murder, he could have been at one of his relative's houses in the surrounding neighborhood. However, defendant did not present testimony from any relative to corroborate this theory.

*supra*, 77 Cal.App.5th at p. 1131 [same]; *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 [same].)  To determine whether any error here was prejudicial under *Watson*, we analyze whether exclusion of the evidence which was necessary only to prove the gang enhancement "would have been reasonably likely to change the jury's verdict of guilt as to the underlying [offenses]." (*Tran, supra*, at p. 1209; see *Watson, supra*, 46 Cal.2d at p. 837 [test is whether it is "reasonably probable that a result more favorable to [the] defendant would have been reached in the absence of the error"].)  We conclude that a more favorable result to defendant was not reasonably likely and therefore any error was harmless.

As noted above, the vast majority of the gang evidence introduced at trial was relevant to the murder charge and the prosecution presented compelling evidence of defendant's guilt, including DNA and gunshot residue evidence linking defendant to the murder, and eyewitness testimony and cellphone evidence placing defendant at the murder scene.  Given this, exclusion of the evidence that was admitted solely to prove the gang enhancement was not likely to change the jury's verdict.

That evidence fell largely into two categories.  First, Detective Murillo testified that the primary activities of LTP in 2014 were attempted murders, assaults, sales of narcotics, possession of illegal firearms, felony vandalisms and kidnappings, and that a murder committed under the circumstances present in the case would have been done for the benefit of LTP.  This testimony overlapped with evidence relevant to defendant's motive to commit murder that one way for gang members to move up in the hierarchy of their gang is to commit crimes, including violent crimes against rival gang members, that gang members would be permitted by the gang to

25

get tattoos after committing crimes (such as the "C" with an X through it defendant displayed after the murder), and that gangs engage in acts of intimidation and violence to maintain their territory in order to facilitate crimes that bring in money for the gang. To the extent it did not overlap with testimony that would have been admissible on the underlying charges, Detective Murillo's opinion testimony on the criminal activities of LTP was concise and did not include any details of specific crimes that could have inflamed the passions of the jury.

Second, information about the identity and criminal activities of other gang members was introduced. Detective Murillo identified Garcia as a member of LTP, a minute order showing that Garcia had been convicted of a crime was admitted, and counsel stipulated that Ponce was a member of LTP and had been convicted of a crime. Neither Garcia nor Ponce was involved in the case otherwise, nor did any evidence connect defendant to either of them. The prosecution did not elicit any potentially inflammatory testimony about the details of Garcia's or Ponce's crime.

The exclusion of both these categories of evidence, when viewed in the context of the entire record, was not likely to lead to a different verdict and is therefore harmless under *Watson*. (See *Tran*, *supra*, 13 Cal.5th at p. 1209.) This is especially true given that, following the presentation of evidence, the trial court instructed the jury, "You may not conclude from . . . evidence [of gang activity] that . . . defendant is a person of bad character or that he has a disposition to commit crime." (CALCRIM No. 1403.) We presume that the jurors understood and followed this instruction. (*People v. Holt*, *supra*, 15 Cal.4th at p. 662.)

26

## C. The Trial Court Did Not Commit Reversible Error in Addressing Defense Counsel's Conflict of Interest

In the motion for a new trial, defense counsel argued she had rendered ineffective assistance in several ways that required a new trial: by failing to consult with experts in memory/eyewitness identification and gangs, failing to excuse a juror who disclosed during trial that his wife's nephew appeared in a picture of several Canta Ranas gang members (none of whom testified at trial),[8] and failing to move to exclude the DNA and gunshot residue evidence because there was a reasonable likelihood such evidence was contaminated. The motion was supported by declarations from defense counsel, a psychologist, and a gang expert.

At the hearing on the motion, the psychologist gave live testimony regarding his expertise in eyewitness memory and suggestibility. Defense counsel and the gang expert were not questioned and did not testify beyond their submitted declarations, although both defense counsel and the prosecutor presented argument. Defendant was present during the hearing but did not personally contend that defense counsel had been incompetent and did not make any type of statement regarding the motion or the issues it addressed. After taking the matter under submission, the trial court denied the motion.

On appeal, defendant does not argue the merits of the underlying issues raised in the new trial motion, that he in fact received ineffective assistance of counsel, or that the claimed

---

[8] Following the disclosure, the court indicated outside the presence of the jury that it would excuse the juror if the defense so requested; no such request was made.

27

errors by his counsel prejudiced the trial's outcome. Instead, defendant argues the trial court erred by not inquiring as to defense counsel's potential conflict of interest in arguing her own incompetence and, if defendant did not waive that potential conflict, by not requiring that independent counsel represent defendant in connection with the new trial motion. Defendant contends we should remand this matter, so that the new trial motion may be relitigated with new counsel.

The Attorney General urges us to apply *Marsden*[9]-related case law to this conflict of interest issue, and find defendant's claim forfeited because neither defense counsel nor defendant gave a clear indication to the trial court that substitute counsel was needed. (E.g., *People v. Sanchez* (2011) 53 Cal.4th 80, 89-90.) *Marsden* motions, however, are all or nothing procedures involving appointed counsel; " '[w]hen a *Marsden* motion is granted, new counsel is substituted for all purposes in place of the original attorney, who is then relieved of further representation. If the *Marsden* motion is denied, at whatever stage of the proceeding, the defendant is not entitled to another attorney who would act in effect as a watchdog over the first.' " (*Sanchez, supra*, at p. 88.)

Defendant, on the other hand, was represented by retained counsel; he could replace his counsel for any reason he wished. (*People v. Ortiz* (1990) 51 Cal.3d 975, 984.) More importantly, the alleged conflict here was not an irreparable breakdown in the attorney-client relationship that would involve new counsel for all purposes, but instead a potential conflict relating to defense

---

[9] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

28

counsel litigating a specific set of issues raised in the new trial motion. It is therefore unclear whether we should follow *Marsden* case law stating that a trial court needs to conduct a hearing "only when there is 'at least some clear indication by [the] defendant,' either personally or through his current counsel, that [the] defendant 'wants a substitute attorney' " (*People v. Sanchez*, *supra*, 53 Cal.4th at p. 90), or instead case law relied upon by defendant that, "When a trial court knows or should know of a possible conflict of interest between a defendant and defense counsel, the court must inquire into the circumstances and take appropriate action." (*People v. McDermott* (2002) 28 Cal.4th 946, 990.)

We need not decide this issue because any error from the failure to inquire as to defense counsel's potential conflict of interest does not require reversal of the ruling on the new trial motion along with remand for re-argument of the motion with different counsel. Defendant argues we should not assess prejudice from the claimed conflict as part of this appeal, but case law is to the contrary. Where a trial court fails to inquire regarding a conflict of interest, reversal is only required where the reviewing court concludes that counsel provided ineffective assistance due to the conflict. (*Mickens v. Taylor* (2002) 535 U.S. 162, 164, 174 [120 S.Ct. 1237, 152 L.Ed.2d 291] (*Mickens*); *People v. Jones* (1991) 53 Cal.3d 1115, 1137; *People v. Bonin* (1989) 47 Cal.3d 808, 837-838.) As summarized by our Supreme Court, *Mickens* "confirmed that claims of Sixth Amendment violation based on conflicts of interest are a category of ineffective assistance of counsel claims that . . . generally require a defendant to show (1) counsel's deficient performance, and (2) a reasonable probability that, absent counsel's deficiencies, the

29

result of the proceeding would have been different. ([*People v.*] *Rundle* [(2008)] 43 Cal.4th [76,] 169, citing *Mickens, supra, . . .* at p. 166.) In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest *'that affected counsel's performance*—as opposed to a mere theoretical division of loyalties.' (*Mickens, supra, . . .* at p. 171; see *Rundle, supra, . . .* at p. 169.)" (*People v. Doolin* (2009) 45 Cal.4th 390, 417-418 (*Doolin*).) This test is the same under both the federal and state constitutions. (*Id.* at p. 421 & fn. 22.)

"[A] determination of whether counsel's performance was 'adversely affected' . . . 'requires an inquiry into whether counsel "pulled his punches," i.e., whether counsel failed to represent [the] defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are . . . bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' [Citation.]" (*Doolin, supra,* 45 Cal.4th at p. 418.) When "the record sheds no light on why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons." (*People v. Diaz* (1992) 3 Cal.4th 495, 557.) "When . . . counsel's reasons are not apparent from the record, we will not assume inadequacy of representation

unless counsel had no conceivable legitimate tactical purpose."[10] (*Id.* at p. 558.)

It is at least a potential conflict of interest for defense counsel to argue that a new trial is warranted because they rendered ineffective assistance to their client. (See *People v. Smith* (1993) 6 Cal.4th 684, 690 [acknowledging "the obvious conflicts defense attorneys have in defending themselves from claims of incompetence by the very clients they are supposed to represent, and in arguing that their clients are entitled to some sort of relief—such as a new trial or withdrawal of a guilty plea— because of their own ineffectiveness"]; *People v. Stewart* (1985) 171 Cal.App.3d 388, 391 [acknowledging "the conflict that usually will arise when a defendant unable to retain a new attorney requests the one who represented him at trial to argue his own incompetence as a ground for new trial"], disapproved on other grounds in *People v. Smith*, *supra*, at pp. 694, 696.)

The situation here does not involve a lawyer's refusal to argue their own ineffectiveness at their client's request.[11] Nor

---

[10] "Because the appellate record ordinarily does not show the reasons for defense counsel's actions or omissions, a claim of ineffective assistance of counsel should generally be made in a petition for writ of habeas corpus, rather than on appeal." (*People v. Diaz*, *supra*, 3 Cal.4th at pp. 557-558.)

[11] Defendant relies on *People v. Stewart*, *supra*, 171 Cal.App.3d 388, but in that case the defendant "personally instructed his appointed trial counsel to file a motion for new trial on the basis of incompetence of counsel," and defense counsel filed a motion which listed incompetence of counsel as a ground for a new trial but "did not state why the attorney was incompetent." (*Id.* at p. 393.) Defense counsel also argued that the court should appoint a new attorney to represent the

does anything in the record suggest counsel pulled her punches in litigating the new trial motion. Counsel filed a robust motion detailing her alleged ineffectiveness supported by evidence to buttress the claims. On appeal, defendant identifies only one aspect of defense counsel's advocacy on the new trial motion which he contends was deficient. Specifically, defendant contends that the declaration from the gang expert "offers no opinions that counsel could have presented to the jury."

As an initial matter, we fail to see how this alleged deficiency relates in any way to the alleged conflict of interest in counsel arguing her ineffectiveness; it is instead a complaint of ineffective assistance entirely unrelated to the alleged conflict of interest. Put another way, it does not follow that because counsel had a potential conflict in arguing her own ineffectiveness, she was somehow inclined to include a less than robust declaration from an expert she nevertheless vigorously argued she was ineffective for not consulting pre-trial. Second, contrary to defendant's characterization of the gang expert's declaration, the expert *did* identify information the expert could have presented to the jury. The expert declared that he could have provided defense counsel with information about a federal indictment of the Canta Ranas gang and the history of the gang. But the record shows defense counsel was aware of the indictment during

_____

defendant on the motion. (*Ibid*.) The court thus addressed what procedure should be followed "[w]here a defendant requests the substitution of new counsel after trial in order to assist in the preparation of a motion for new trial based on the inadequacy of trial counsel." (*Id.* at p. 395.) Here, in contrast, neither defendant nor defense counsel indicated that defendant desired to have a new attorney represent him on the new trial motion.

the trial and questioned Detective Murillo about it. The gang expert additionally stated in his declaration, "I am aware that [LTP] and Canta Rana[s] criminal street gangs have had incidents involving members from these two gangs, but that [LTP] is certainly not one of Canta Rana[s]'s 'biggest enemies[.']" If the defense had called the gang expert to offer this opinion, it would have been of little moment: it shows the two gangs had past incidents between them and were antagonistic to one another even if Canta Ranas had bigger enemies than LTP. Finally, to the extent defendant suggests the gang expert could have offered some other relevant and exculpatory opinion, but did not because of counsel's alleged conflict, he fails to identify it and more importantly why the alleged conflict hindered counsel from presenting it as part of the new trial motion.

We find defendant's reliance on California Rules of Professional Conduct, rule 3.7(a) (rule 3.7(a)) similarly unavailing. As relevant here, rule 3.7(a) prohibits a trial lawyer from being both an advocate and a witness unless "the lawyer has obtained informed written consent from the client." (Rule 3.7(a)(3).) Defendant argues that rule 3.7(a) is implicated because defense counsel submitted her own declaration in support of the motion and discussed her thought process during oral argument. But rule 3.7(a) is not relevant to the issue we must decide, namely, whether the record indicates counsel's performance was adversely affected by a potential conflict of interest. Even assuming that defense counsel should have obtained defendant's written consent and failed to do so, this does not suggest that counsel's performance in arguing the new trial motion was adversely affected by any conflict of interest. (See *Nix v. Whiteside* (1986) 475 U.S. 157, 165 [106 S.Ct. 988, 89

33

L.Ed.2d 123] ["breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel"].)  To the extent defendant contends that defense counsel would have provided additional testimony beyond her declaration had she not felt bound by rule 3.7(a), the argument fails because there is no indication counsel held back additional testimony for this or any other reason, and defendant does not identify any testimony that counsel could have provided but failed to present based on rule 3.7(a).

In sum, nothing in the record shows that any potential or actual conflict " 'adversely affect[ed] counsel's performance.' " (*Doolin*, *supra*, 45 Cal.4th at p. 418, quoting *Mickens*, *supra*, 535 U.S. at p. 172, fn. 5.)  Our review of the new trial motion proceedings does not disclose any reason to conclude that counsel " 'failed to represent defendant as vigorously as [s]he might have, had there been no conflict.' "  (*Doolin*, *supra*, at p. 418.)  Given the failure to demonstrate prejudice, remand for further proceedings on the new trial motion is unwarranted.

## D.  Defendant's Contention that the Case Should Be Remanded to Consider Striking the Firearm Enhancement or Substituting a Lesser Included Enhancement Fails

Defendant lastly contends the trial court misunderstood its sentencing discretion concerning the firearm enhancement, and we therefore should remand for the trial court to consider whether to strike the firearm enhancement or impose a lesser included enhancement.  In making this argument, defendant relies on two cases, *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*) and *Nazir v. Superior Court* (2022) 79 Cal.App.5th 478 (*Nazir*).

In *Tirado*, our Supreme Court held that a trial court has discretion to strike a section 12022.53, subdivision (d) firearm enhancement and impose one of the lesser enhancements. (*Tirado*, *supra*, 12 Cal.5th at p. 697.)  The court issued its decision on January 20, 2022, 13 days before the court sentenced defendant.  Defendant argues we should remand for resentencing because the record does not indicate the court or counsel was aware of *Tirado*, and the court and counsel spoke only of whether or not to strike the enhancement altogether instead of potentially reducing it to a lesser enhancement.

While there was no discussion on the record about the *Tirado* decision or about striking the enhancement and replacing it with a lesser enhancement, there is likewise no indication that the court was unaware of its ability under *Tirado* to strike the enhancement and replace it with a lesser enhancement.  "Absent evidence to the contrary, we presume that the trial court knew and applied the governing law." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390.)  We thus presume the trial court was aware of its sentencing discretion under *Tirado* and decided not to exercise it.

Relying on *Nazir*, defendant argues the trial court failed to understand the scope of its sentencing discretion because, in responding to a defense argument that imposition of the firearm enhancement would be inequitable because the district attorney stopped filing such enhancements after defendant's trial, the court stated, "I don't follow the directive of the district attorney's office."  In *Nazir*, the prosecutor moved to dismiss firearm enhancements alleged under sections 12022.5 and 12022.53 based on the Los Angeles District Attorney's Special Directive 20-08, which "instructed deputy district attorneys in pending cases

to move to dismiss or withdraw sentence enhancement allegations." (*Nazir, supra*, 79 Cal.App.5th at pp. 486-488.) The trial court in that case denied the motion based on its belief that it was not permitted to rely on the directive under *People v. Williams* (1998) 17 Cal.4th 148 (*Williams*). (*Nazir, supra*, at pp. 497-498.) The *Nazir* court held that *Williams* did not preclude the trial court from relying on the district attorney's directive, and thus the trial court "misunderstood the scope of its discretion when it refused to consider Special Directive 20-08 in determining whether to grant the motion to dismiss the firearm enhancements." (*Nazir, supra*, at p. 497.)

The situation in this case does not compare to *Nazir*. Here, in response to defense counsel's request that the trial court strike the firearm enhancement based on Special Directive 20-08, the trial court first stated, "I don't follow the directive of the district attorney's office." The court then went on to clarify to defense counsel, "If you want to bring up the merits of that, you can, but I don't follow the D.A. just because the D.A. tells me to." Defense counsel agreed, and clarified she was "not saying that the court is in any way mandated to follow what the D.A.'s office says. I actually believe that the complete opposite is what holds true. The court is not mandated to do anything that the D.A.'s office tries to direct the court to do." Defense counsel then argued it would be inequitable for the court to impose the firearm enhancement when the district attorney was not charging similarly situated defendants with firearm enhancements because of the directive. Counsel further argued that defendant was young at the time of his arrest, and he had no prior convictions for a similar crime.

36

The court decided not to strike the firearm enhancement, stating, it was "exercis[ing] its discretion not to strike the gun allegation. The reason being is that the victim was this older man on a bike, not posing a threat to anyone. He was shot five times. . . . [A]nd . . . defendant had a prior conviction, a felony conviction in which he had already served a term in state prison. So even though he was young, he was not somebody who . . . had no prior criminal record and this came out of nowhere."

Thus, unlike in *Nazir*, nothing in the record shows that the court misunderstood its sentencing discretion. Rather, the court properly indicated the district attorney's directive did not bind it, gave defense counsel an opportunity to discuss any factors underlying the directive which defense counsel believed applied to the case, and exercised its discretion based on the facts of the case before it. (See *Nazir*, *supra*, 79 Cal.App.5th at p. 499 [a trial court may deny a motion made by the People to dismiss an enhancement under Special Directive 20-08].) Accordingly, there is no need to remand this case for re-sentencing.

## DISPOSITION

The judgment and order are affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P.J.          CHANEY, J.

37